United States Court of Appeals for the 4th Circuit Our next case is number 19, 1930 Rodriguez Bedoya v. Attorney General Barr Mr. Banas, good to have you with us, sir. Thank you, your honor. Good afternoon and may it please the court. My name is Brad Banas and I represent the petitioner in this case. This court has held for nearly the last decade that credible death threats alone constitute past persecution. Here, Officer Bedoya provided credible uncontested testimony about receiving various threats from the FARC in Colombia and as such he has demonstrated past persecution and therefore this court should grant this petition and remand this back to the immigration judge with instructions to continue proceedings. Since at least 2011 in a case called Crespin-Vallartes, this court has made it clear that credible death threats are sufficient to qualify as past persecution for demonstrating asylum. Now, Crespin does not indicate that every time a government actor threatens the life of someone in passing that that constitutes past persecution. Instead, it's pointed that context is important and Crespin and the progeny of that case have indicated a handful of things that this court tends to look at to determine whether a death threat is credible and sufficient to qualify as past persecution. The first factor they consider is whether the person communicating the death threat has the ability to follow through on it. In Crespin, it was MS-13 and this court noted that that particular group had a distracting vengeance on people. So obviously that group, a death threat coming from that group, meant business. Second, whether there are parallel threats to family, that is whether the threats go beyond just the individual applicant or to their family members. Third, whether the threats are isolated, distant from each other, whether they are repeated, and then finally the method and means of how those threats are communicated, that is in writing, in And I would indicate that all of these factors, these context clues, indicate that the the communications here to Officer Bedoya are indeed credible death threats that qualifies persecution under this court's law. And, Council, sorry, this is Judge Harris. Can I just ask, so is it your understanding that the BIA sort of made what we would think of as a fact error that no reasonable fact finder looking at the surrounding contextual facts could have concluded that these were not credible death threats? Or was it more of a legal error that the BIA just didn't apply the law correctly? Your Honor, I believe it's the latter, that they misapplied the law and they adopted a standard of death threats plus, which is what the agency here argues for in its response brief, that they are saying that you have to have a death threat plus some form of violence or harm to the petitioner or a family member or someone closely associated with them. And if you look at the language of the BIA decision, I believe it's on page three of the record here, they note that these were merely written, not verbally communicated threats, and that Officer Bedoya was never directly approached by a FARC member. And that seemed to be the support for their determination that these were not, quote, sufficiently menacing to be credible death threats under this circuit's precedent. So I do believe they apply a standard unknown to this circuit's case law that requires some sort of in-person or extra act for a credible death threat to be passed persecution. And I do believe this comes from a recent decision out of this court, which is called Cortez Mendez, and the government cited the link, but it's really just one footnote there that Judge Agee put, and it's dicta. I think that court, or that particular panel, indicates clearly that they didn't need to reach the question of whether these death threats were persecution, but Judge Agee points out his concerns that here, those death threats, because they were distant verbal threats and that he was never physically harmed, he expressed that he was very dubious that would constitute past persecution. And it seems to give credence to the government and the BIA's urging this court to adopt an analysis that is unknown to this court. And I think the better way of describing it is maybe those are factors, maybe those are context clues that would separate eligibility criteria for death threats to constitute past persecution. And so I do think it is a legal error, Judge Harris. And I will just run through the facts here, just to kind of put them in context. These are all written communications. If you look at page 466 and 468 of the record, you'll see the FARC logo is on a piece of paper. And then threats that identify they know exactly who Officer Bedoya is, they know his exact history, and implicit in putting these under his front door is that they know where he lives. They know where he sleeps. And we argue in our time. No, Your Honor, he was not. He had been with the National Police since 1992. And he even notes in his testimony with the immigration judge that for the first year of his retirement is pretty quiet. But in 2013, apparently the FARC had found him and noted that and the first death threat you are now but now that you are out of the police force, we will take care of the pending issues. That's a quote from the note they put under his door. So this is pretty typical in the evidence. The record has evidence that FARC does target former police officers. And it appears as though the FARC still had some outstanding issues with Officer Bedoya. And I would just know there are two notes. But the FARC is a revolutionary army and and they've made a treaty or something with the Colombian government. Your Honor, I I believe that there were political talks between the FARC and the Colombian government to try to to come to some peace treaty in 2013. I believe that was a much more fluid situation than it is now. And that's that's the context we're talking about. And regardless, they had identified Officer Bedoya. They had identified why they were threatening him. And it was his prior participation as a national police officer. And they even I mean, the note says the matter on 1995 is still pending, which as Officer Bedoya testified, and in that year, one of his investigations led to the death of three FARC members. And apparently, they have a very long memory. This is Judge Keenan. Is there any evidence in the record, either documentary or testimonial regarding how well this 2016 peace accord has held up over time? Your Honor, I believe there are a couple of articles, but I don't believe there's anything definitive. I would point you to the records that start at page 185 and go through about page 300, which do contain the country reports and some news articles. But I would also suggest that that may go to an analysis of whether my client can prove, or I should say, whether if we've shown past persecution, the burden shifts to the government to show that, to rebut the presumption of future persecution. And then if they can rebut it, then my client has the opportunity to try to demonstrate a well-founded fear of persecution. And if this court finds that he suffered past persecution, that's the end of the analysis. This case should be, this petition should be granted, and it should be randomly handed back to an immigration judge, because the burden then on my security to overcome the presumption of a well-founded fear of future persecution. And then I believe, Your Honor, that these questions of whether FARC is still a viable threat, it may be relevant, but for the issues that we have in front of this court at this point, I think that it's limited to whether these death threats are indeed viable. And I do believe that. Yeah, let me follow up with another question. I don't need to cut you off there. What about the passage of time between threats in 1995 and 2013? How do we factor that into the analysis that we need to apply? Your Honor, I believe that the threats in 2013 alone are sufficient as credible death threats. In our brief, we don't rely exclusively on the 1995 death threat as sufficient. We point more to the series of messages between January and May of 2013. And of course, that 1995 is important, that 1995 death threat is important for context to point out what the FARC meant in 2013 when they said the matter in 1995 is still pending. But if we only had the 1995 death threat, I think it would be a very real problem for my client. But we rely on the series of communications both in writing and in text message in 2013. And the 1995 incident is more to provide context and meaning to the systemic, excuse me, repeated death threats in 2013. And I should note, the last one came on May 6. And it said, let it be at the end of the month. And so my client's reaction was to leave by the end of the month. And he arrived in Miami on May 27. Because at that time in Columbia, he had subjective and objective fear that he would be murdered if he didn't leave. And again, this is asylum cases are very fact intense, and they have a lot of issues. The issue in front of this court today, as the BIA limited it is simply whether these written death threats can constitute past persecution. And I think under this court's consistent case law over the last decade, we see the BIA make a legal error by requiring more than just uncontested, credible death ways that are different than just walking by someone on the street. These folks knew where he lived, they knew where his children were around the country, and they made it clear what they were going to do. And for that reason, we would ask this court to grant this petition and remand this case back to the immigration judge for further proceedings. Thank you, honors. Thank you, Mr. Banas. Ms. Aguizmane, you're representing the Attorney General. Good to have you here. Yes. Thank you. May it please the court. My name is Elisa Aguizmane. I represent Attorney General Barr. I am a different attorney than originally wrote the brief, but I stand with the comments made in the brief. We agree with appellant that our petitioner that the 1996 is separate from the five threats in 2013. Counsel, this is Judge Harris. Can I just ask you a quick question? The 1996 threats, they're still relevant, right, to give some sort of context to the meaning of the threats that were flipped under his door in 2013? Or are you suggesting that we really can't look at them at all? Oh, no. You can look at them. Okay. They give context for sure. Do you feel like the... I'm sorry. Do you feel as though the IJ and the BIA looked at them for context? Because I didn't get that. So I feel that they both looked at them because they were looking at a pattern and practice. But you would agree that if the IJ and the BIA had simply said, we're not looking at those, those were a long time ago, they're separate, and had not used them to give context to the meaning of the 2013 threats, that would be a mistake. Yes. Okay. I agree. Thank you. What I will say is that all four... So the record does not compel the reversal of the agency's findings, because Bedoya did fail to meet his burdens of proof. While threats of death alone can be sufficient to establish a past persecution Bedoya... I'm sorry? Hello? You there? Yep. Anybody... Did somebody ask a question? No, you go right ahead. Okay. I can hear you just fine. Go right ahead. Bedoya only cites cases in which threats of death are actually stated, and there's a confrontation between the persecutor and the persecutee. So for example, Crespin v. Valadores, there are similar threats under the doors. However, Crespin drove through Sonsenada and encountered one of his persecutors who shouted, you need to shut up or we're gonna kill you. So your understanding... I'm sorry, your understanding of Crespin is that the court discounted the two threats that were pushed under the door. Those were not the threats, the only threat that really counted was the one that was face to face? No, my argument is that those two plus a face to face. And what do you do with the case... And I'm so sorry, I cannot remember the names, there have been so many, but the case where the gang sent the children into the store to deliver the death threats? Hernandez... And there was no confrontation with the gang member. Yeah, there was no confrontation with the gang member in that case, right? I'm trying to... So I've got Farrah Holmes... Sorry, I know you're... I'm not sure that I have the case you're thinking of. Alright, I'll find it. You go on with your argument and I'll come up with it. Okay, so same with Hernandez Alvarez. So following up... Right, so the counsel, Ms. Alishmony, when you look at Hernandez Alvarez, the court is pretty categorically stating here on page 949, as to the first requirement, we have expressly held that the threat of death qualifies as persecution. We don't qualify the statement by saying the threat of death made face to face, or the threat of death orally, or the... There are no qualifiers on that statement. We say we have expressly held that a death threat qualifies as persecution. It seems to me that you're asking us to add something to our precedent. I don't see any language. You're talking about the holdings, but when you look at the actual language, point us to any language in our precedent. I would have two statements to that. First, a death threat can definitely rise to the level of persecution. Here, we've got some things that are vaguely threats, such that Petitioner's five that constituted a death threat. There's no specific death threat. You can imply a death threat here, but that is that. But that... The Hernandez Alvarez doesn't make an explanation, and there is no explanation for what the death threat needs to look like. Is it flipped under a door? Is it face to face? Is it... But isn't the implication that it really doesn't matter that any credible threat of death is severe enough to rise to the level of persecution? The fact that it wasn't qualified is sort of the point. We don't agree with that. I understand your point. What do you not agree with? That with the death threat came face to face... That one was particularly horrifying. Following the husband's burial, heavily armed gang members came to her house and threatened to kill her if she identified the gang members to the authorities as the men responsible for killing her husband. Counsel, it's just... Sorry, this is Judge Harris again. The case I was thinking of is of Aleda Policiano versus Sessions, in which the gang was sending children into a store with a death threat. So there was no face to face confrontation with anyone scarier than a child. And I do wanna say that even if I thought our precedent supported a requirement that a death threat be delivered in person, and I don't see that, I don't even understand the intuition driving it. It strikes me that coming home to your home and finding a note shoved under the than running into someone in public where you might feel less safe anyway, who says something to you. So I just don't... Not only do I not see it in our case law, I don't get what you're driving at. Why would we attach some significance to whether a threat is made face to face rather than in a way that alerts the person being threatened that the person who is threatening to kill them knows where they live? Because not all threats of death are to the level of persecution. Right, and that might be true, but why would it matter in sorting through the ones that are credible and the ones that are not, whether they are delivered face to face? I'm just asking you, what is the common sense reason why, even though we have never before, we might be moved to adopt such a requirement in this case, that only threats delivered face to face and not those shoved under somebody's door may be credible? Because that's what you have in your courts right now. There are no cases currently that say... I mean, obviously, Hernandez Zavalos does say it, but it doesn't rely on it. It doesn't say just because Mara 18 threatened them, it's good. It goes on to explain the substance of what happened. So, had they just said a death threat is sufficient and stopped there, then maybe you would have case law that has that in the Fourth Circuit, but that's not what's happening right now. Do you... This is Judge King. Is it your position that we have to say that a death threat constitutes persecution in order to rule against you? No, but I would say that most of the other circuits do have a higher... A much higher basis before getting to pass persecution. And I can tell you a bunch of different cases if you're interested, but... That's okay. We're in the You're going to have to... You would have to say death threats alone, but here, you know, if you read the declaration on its own, so AR at 416, he... It is implied. I will agree with that, but this... I mean, so you're going to have to, when you write this new case law, you're going to have to include the fact that implicated death threats are... Or implied death threats. And implied death... You're questioning... Do you question the... I mean, the government, Attorney General, question the source? Do you think that this FARC is too feeble to carry out a death threat, be dangerous anymore? So the documents itself show that they're not going after policemen in... Any longer. That FARC only hits military death, or military, and no longer police. And that's out of his own statements. And so I guess I'm moving forward, but yeah, if you read what's written, it is, there's no, I'm going to kill you. Excuse me, counsel, this is Judge Harris. That's why I started at the very beginning with the 1995 and 96 explicit threats of death, and asked whether those would give context when we look at the 2013... So those are not... Those are third-party threats. But they're expressed. They are expressed threats of death. Yes, that... Okay. And you agree those can be considered, and that they put everything in context? I do, but I don't think a third-party death threat counts, as to... I was giving you that. I was saying that it works in context to say that somebody heard there was an issue, and not somebody, but his friend, the farmer. And I would argue that he was killed because he lied, not because he was threatened, honestly. And so... I'm sorry. I'm sorry, counsel, to say that again. I just want to make sure I understand that the friend who warned the petitioner here of the death threat was murdered because he lied to FARC? Yes. Okay. Because he was not... He hadn't done anything that would get FARC on his back, except for lie to protect... And so you're... Is the reason you're saying this, because you think that Mr. Bedoya should sort of separate that out, and be thinking like, look, FARC only murders the people who lie to them, so I'm probably fine here? No. I'm not trying to be as ridiculous as it... I don't understand what point you're trying to make. I'm trying to make the point that there was no actual legal or written threat, or oral threat, other than the third party. So, January 2013. Mr. Rodriguez, now that you're out of the police, we'll take care of that pending issue. We're returning to the area of matters on 1915... 1995 is still pending. In March, another written note, same logo appearing under the door. You don't believe... You seem not to believe us. We're going to breathe in your ear. Have you heard the bombs in Savannah? You better know that we are close to you. Again, it's implying, but there's nothing in there that says... Then we get the text message saying, it doesn't matter how much you hide, we will hunt for you, and if not you, we will catch one of your children, and let's see if you appear. So that's not a threat against his daughter. It's not a threat against him. I started... So then he gets a second text on that day that says, we know your daughter is in Medellin. And at that point, he gets worried. And he is the one who says, I'm not hiding. He sends a text message to the petitioners, and he says, I'm not hiding. I'll be back in 20 days, at the end of the month, and that's when the last one comes, that I think is the most implicative of sincere harm. And that is, okay, then we'll see you at the end of the month. But that was in response to what he had said to them. If you look at page AR-416, his declaration attached to his asylum application, so here you've got implied, and even if you look at the opening brief at 7, the petitioner says there are at least five threats constituting death threats. He doesn't say there are five death threats. And even in the Fourth Circuit, you don't have any... You have a statement that says, in Hernandez-Avalos, you have a statement that a death... Every court has a statement that a death threat alone can constitute past persecution. But you don't have any findings that they do. Okay, but you're adding words to Hernandez-Avalos. Judge Keenan, you agree, don't you? You're grafting can onto the words of the court at 949, when we said we have expressly held that the threat of death qualifies as persecution. We didn't say can qualify, we said it qualifies. Okay, I would challenge you to find a case in... I mean, I guess this might be it, where just the threat without further intimidation or confrontation allows past persecution. You can look at Zabaleta Policiano. I mean, unless it's the confrontation with the children with the notes. Right. That's the confrontation you have in mind that really notched that one up, is the children coming into the store? I have it on here, I'm sorry. Zabaleta Policiano? Yeah. So, that's a separate situation just because it didn't pass based on the nexus or type of... Yeah, I mean, the store received multiple calls, but also had direct contact, but not with the gang members. It doesn't matter, I'm sorry, I didn't mean to interrupt you. No, that's okay. My time is up. Well, we appreciate you being with us. Appreciate your help. Thank you. And we're going to hear from Mr. Banas in rebuttals, if he agrees with what you just told us. Thank you, Your Honor. Just two quick points. My opposing counsel indicated that this court would be writing new case law if it found in favor of Officer Bedoya. And I think that this court would be simply reaffirming the case law of this circuit that has been the case law of this circuit for at least the last decade, if not farther back to the Lee case in 2005. And the second point is just the emphasis of that case law is that context matters. And this idea that what I gather is that the government would prefer to have some sort of express, we are going to kill you language in one of these threats is simply not required. And if we focus on context, things that do not say I'm going to kill you clearly are death threats. And the one example I can kind of think of is if I tell my daughter we're going to go swim with the fishies, and by that I mean camp on the beach, that's not a death threat. But if Clark puts a note under Officer Bedoya's house – or under his door that says you're going to be swimming with the fishies, that's a death threat. And so the exact words have to be seen in context, and I think that's what this court's long history of case law indicates. And I would just urge this court to apply that to the facts of this case and grant this petition and remand this back to the immigration judge for further proceedings.  Thank you. Thank you very much. Like both of you, we really appreciate your assistance with this case, and we'll take it under advisement. And Madam Clerk, it's time for another brief break before we hear the final case today.
judges: Robert B. King, Barbara Milano Keenan, Pamela A. Harris